# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

GARY CRAIG ROSALES,

                                        Petitioner,

v.

GABRIELA NAJERA,[1] et al.,

                                        Respondents.

Case No. 3:16-cv-00003-RCJ-CSD

**ORDER**

Petitioner Gary Craig Rosales ("Petitioner" or "Rosales") filed a counseled second amended petition for writ of habeas corpus under 28 U.S.C. § 2254. (ECF No. 54 ("Petition").) This matter is before this Court for adjudication of the merits of the remaining grounds in the Petition.[2] For the reasons discussed below, this Court denies the Petition and a Certificate of Appealability.

## I.      BACKGROUND

### A.      Factual background[3]

Between November and December 2004, an individual shot .32-caliber bullets through the kitchen windows of seven occupied homes in Reno, Nevada. (*See* ECF No. 18-26 at 132.) The same type of bullet used in each of those shootings had also been used in the shooting of Evelyn

---

[1]The state corrections department's inmate locator page states that Rosales is incarcerated at the Southern Desert Correctional Center. Gabriela Najera is the current warden for that facility. At the end of this order, this Court directs the clerk to substitute Gabriela Najera as a respondent for Respondent Dwight Nevada. *See* Fed. R. Civ. P. 25(d).

[2]This Court previously dismissed grounds 1, 2, 3, and 4. (ECF No. 76.) And Rosales intentionally omitted ground 7. (ECF No. 54 at 34.)

[3]This Court makes no credibility findings or other factual findings regarding the truth or falsity of this evidence from the state court. This Court's summary is merely a backdrop to its consideration of the issues presented in the Petition. Any absence of mention of a specific piece of evidence does not signify this Court overlooked it in considering Rosales's claims.

Castillo in 2000 in Reno. (*Id*.) Castillo testified that on March 31, 2000, she was employed at the Kietzke Plaza to clean offices after business hours. (ECF No. 18-28 at 18–19.) Castillo exited a bathroom that she had been cleaning and saw a man standing in the hallway. (*Id*. at 19.) Castillo "heard some shots" and ran into a conference room. (*Id*. at 21.) Castillo realized she had been wounded and called 911. (*Id*. at 21–22.)

Richard Gammick, the Washoe County District Attorney at the time of Rosales's trial, testified that from January 9, 1999, through December of 2004, an individual had put "wanted posters" up around Reno "that talked about bounties being paid for deaths" of law enforcement officers. (ECF No. 18-26 at 109–110.) During this time, an individual graffitied over one hundred various building in Reno. (*Id*. at 110, 137.) The graffiti included death threats made against Gammick as well as the Chief of Police and Assistant Chief of Police, pleas to the community to kill police officers, pornographic comments about female police officers, praise of the previous killing of a Reno police officer killed in the line of duty and pleas for the community to sodomize that police officer's wife and children, and many swastikas. (*Id*. at 111–112; *see also* ECF No. 51-14.) Some of the graffiti appeared to take credit for the shooting of Castillo: "I did the Kitzkie [sic] Ln Shooting!! 32 ACP 2 shots 1 hit lower leg." (ECF No. 18-26 at 113.) The individual also made calls to 911 and called Gammick at his home and office in October and December 2004, threatening him, ridiculing him, and insinuating that he had been following him. (*Id*. at 152.)

The FBI determined that the telephone calls were made from a cell phone previously registered to Rosales. (ECF No. 18-26 at 12.) And a handwriting expert determined that at least some of the posters and the graffiti taking credit for the shooting of Castillo were written by Rosales. (*Id*. at 177–178.) Law enforcement received an arrest warrant for Rosales, who had moved to Whittier, California. (ECF No. 18-23 at 35.) Rosales was arrested and taken to the Whittier

1  Police Department. (*Id*. at 36.) During his initial interview, Rosales did not acknowledge any

2  connection with the graffiti, shootings, or telephone calls. (*Id*. at 66.) While Rosales was being

3  interviewed at the police station, two detectives went to Rosales's residence to contact his mother.

4  (*Id*. at 38.) Rosales's mother consented to a search of the residence, and a 32-caliber handgun with

5  a "drilled out" barrel[4] was located. (*Id*. at 39–40.) The handgun was taken back to the police station

6  and shown to Rosales. (*Id*. at 39.) Rosales was interviewed again and admitted to shooting Castillo

7  and shooting into five of the seven residences. (ECF No. 18-26 at 209.) Regarding the shooting of

8  Castillo, Rosales "claimed to have closed his eyes" and stated he "was probably more scared than

9  her afterwards." (ECF Nos. 18-23 at 80; 16-11 at 11.) Rosales also stated that he "didn't want to

10 hurt nobody" and that he drilled out the barrel of his gun after a bullet got lodged. (ECF No. 16-

11 11 at 3, 10.)

12      Rosales testified that he purchased the 32-caliber handgun in 1999. (ECF No. 18-29 at 20.)

13 Rosales later sold the handgun to a man named Eric Klein because the handgun had misfired, a

14 bullet was lodged in the barrel, and it was inoperable. (*Id*. at 23.) By happenstance, Rosales saw

15 Klein a month later when Klein stopped to talk to Rosales while he was working outside on his

16 car. (*Id*. at 29.) Klein told Rosales that he was able to get the bullet out of the barrel by drilling it

17 out. (*Id*.) This statement made Rosales nervous because Rosales's "name was attached to that gun."

18 (*Id*.) Rosales told Klein that he should call the police or the ATF to report the altered gun, and

19 Klein threatened Rosales, saying, "well, if I go do something, maybe I'll just leave this handgun

20 at the scene and get you implicated." (*Id*.)

21

22

23

---

[4]There had been mentions in the graffiti and telephone calls about "a smooth-bore .32" handgun. (ECF No. 18-23 at 41.)

According to Rosales, over the next few years, Klein visited him on many more occasions. (*Id*. at 30–33.) At one point, Klein told Rosales that he was going to shoot Gammick. (*Id*. at 34.) Rosales called the non-emergency police number to anonymously report this threat. (*Id*.) Klein approached Rosales shortly after and asked whether Rosales had reported the threat. (*Id*. at 35.) When Rosales denied it, Klein put a gun to Rosales's head and "dry" fired it. (*Id*.) Later Klein showed Rosales a picture he had taken of Rosales's mother, indicating to Rosales that Klein was stalking him. (*Id*. at 36.) Klein later asked Rosales for a place to stay, and they agreed that Rosales would leave his car unlocked at night so that Klein could sleep in it if needed. (*Id*. at 38.) At one point, Klein asked Rosales if he had any old cell phones that Klein could have to play games on, and Rosales gave him two or three phones that were inactive. (*Id*. at 41.) Near the end of 2004, Rosales asked Klein to sell the gun back to him because Rosales was moving to California and did not want to be implicated by the handgun. (*Id*. at 39.) Klein agreed. (*Id*.)

Rosales testified that he made untrue statements in his second interview with law enforcement because he was intimidated by Klein. (*Id*. at 47.) And during trial, Rosales denied shooting a firearm into any of the seven residences, stalking Gammick, and shooting Castillo, instead implying that Klein was the culprit. (*Id*. at 48–49.)

## B.    Procedural background

Rosales was charged with 7 counts of discharging a firearm at or into an occupied structure, aggravated stalking, attempted murder with the use of a deadly weapon, and criminal anarchy. (ECF No. 16-19.) Rosales pleaded guilty to five counts of discharging a firearm at or into an occupied structure and aggravated stalking. (ECF No. 17-15.) Rosales was sentenced to 28 to 72 months for each of the discharging a firearm convictions and 72 to 180 months for the aggravated stalking conviction. (*Id*.) All sentences were ordered to run consecutive. (*Id*.) Rosales appealed,

and the Nevada Supreme Court reversed, finding that the state district court improperly participated in the plea negotiations. (ECF No. 17-26.) On remand, the Nevada Supreme Court ordered Rosales to be given the opportunity to withdraw his guilty plea. (*Id*.)

Following the remand, Rosales withdrew his guilty plea, went to trial, and was found guilty of seven counts of discharging a firearm at or into an occupied structure, aggravated stalking, attempted murder with the use of a deadly weapon, and criminal anarchy. (ECF No. 18-32.) Rosales was sentenced to 28 to 72 months for each of the discharging a firearm convictions, 72 to 180 months for the aggravated stalking conviction, 96 to 240 months for the attempted murder conviction, and 28 to 72 months for the criminal anarchy conviction. (ECF No. 18-39.) All sentences were ordered to run consecutive. (*Id*.) Rosales appealed, and the Nevada Supreme Court affirmed in part and reversed in part. (ECF No. 19-12.) Specifically, the Nevada Supreme Court reversed Rosales's criminal anarchy conviction because although "Rosales's writings . . . are both hate-filed and heinous, . . . they provide no hint that he sought to rouse the populace to overthrow organized government by force or violence." (*Id*. at 4–5.) The state district court amended Rosales's judgment of conviction to remove his conviction and sentence for criminal anarchy. (ECF No. 19-15.)

Rosales filed a *pro se* state post-conviction petition and a counseled supplemental petition. (ECF Nos. 19-16, 19-22.) Following an evidentiary hearing, the state district court denied the petition. (ECF No. 19-29.) Rosales appealed, and the Nevada Supreme Court affirmed. (ECF No. 19-35.)

Rosales filed his *pro se* federal post-conviction petition. (ECF No. 6.) This Court appointed counsel for Rosales, and counsel filed a first amended petition. (ECF No. 15.) Respondents moved to dismiss the first amended petition, and this Court granted the motion in part, finding that four

grounds in the first amended petition were not exhausted. (ECF No. 37.) Rosales moved to stay

this case. (ECF No. 38.) This Court granted the request. (ECF No. 47.) Rosales later moved to lift

the stay and to file a second amended petition. (ECF Nos. 50, 52.) This Court granted both requests.

(ECF No. 53.) Rosales filed his counseled second amended petition on December 2, 2020. (ECF

No. 54.) Respondents moved to dismiss the second amended petition, and this Court granted the

motion in part, dismissing grounds 1, 2, 3, and 4 as procedurally defaulted. (ECF No. 76.)

Respondents answered the remaining grounds in the second amended petition on June 29, 2022,

and Rosales replied on September 27, 2022. (ECF Nos. 79, 83.)

## II.    GOVERNING STANDARD OF REVIEW

28 U.S.C. § 2254(d) sets forth the standard of review generally applicable in habeas corpus

cases under the Antiterrorism and Effective Death Penalty Act ("AEDPA"):

> An application for a writ of habeas corpus on behalf of a person in custody pursuant
> to the judgment of a State court shall not be granted with respect to any claim that
> was adjudicated on the merits in State court proceedings unless the adjudication of
> the claim—
>
> (1) resulted in a decision that was contrary to, or involved an
>     unreasonable application of, clearly established Federal law, as
>     determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable
>     determination of the facts in light of the evidence presented in
>     the State court proceeding.

A state court decision is contrary to clearly established Supreme Court precedent, within the

meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing law

set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are

materially indistinguishable from a decision of [the Supreme] Court." *Lockyer v. Andrade*, 538

U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000), and citing *Bell v.*

*Cone*, 535 U.S. 685, 694 (2002)). A state court decision is an unreasonable application of clearly established Supreme Court precedent within the meaning of 28 U.S.C. § 2254(d) "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 75 (quoting *Williams*, 529 U.S. at 413). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous. The state court's application of clearly established law must be objectively unreasonable." *Id.* (quoting *Williams*, 529 U.S. at 409–10) (internal citation omitted).

The Supreme Court has instructed that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has stated "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102 (citing *Lockyer*, 538 U.S. at 75); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the standard as a "difficult to meet" and "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt" (internal quotation marks and citations omitted)).

**III.    DISCUSSION**

   **A.    Ground 5—appellant counsel's failure to request a new trial**

In ground 5, Rosales alleges that his appellate counsel was ineffective for failing to request a new trial in the event the Nevada Supreme Court overturned his criminal anarchy conviction in violation of his rights under the Fifth, Sixth, and Fourteenth Amendments. (ECF No. 54 at 29.) Rosales explains that the introduction of the graffiti photographs had no bearing on any charge

1 besides criminal anarchy, and because the criminal anarchy conviction was reversed, those

2 photographs, which were highly prejudicial, were irrelevant to the prosecution's case. (*Id*. at 30.)

3 **1.     Background information**

4     During the post-conviction evidentiary hearing, regarding the instant claim, Rosales's

5 appellate counsel testified:

6     [A]t no point in the brief did I argue to the Supreme Court that in the event
7     you reverse the anarchy conviction, you have to send the whole matter back for a
    new trial without the taint of that. Primarily because, as I mentioned earlier, the
    other issues were raised as independent issues. The Court found that the evidence
8     was sufficient to sustain the discharge, the firearm charges was sufficient to sustain
    the attempted murder and was sufficient to sustain the aggravated stalking.
9     To the extent that the evidence that was presented, although nasty all that
    graffiti was presented as related to the anarchy charges. As related to the other
10     charges, obviously, some of those could be related to the aggravated stalking with
    regards to the threats against Mr. Gammick. May not have anything to do with the
11     other charges, although I believe there was one piece of evidence, graffiti that may
    have referenced a shooting into a structure. I think there was – it's been awhile
12     since I looked at all of those exhibits.
    In any event, I did not raise that and, frankly, I'm not sure had I raised, had
13     I suggested to the Supreme Court, if you reverse the anarchy charge, you should
    reverse all counts and send it back for a new trial, I don't believe I would have been
14     successful on that. I don't think the Court would have said that's a good idea.

15 (ECF No. 19-26 at 21–22.) Rosales's appellate counsel also testified that he had "argued crossover

16 effect, crossover contamination, that the evidence presented on this particular issue improperly

17 influenced or may have been improperly used by the jury in some other charge" in other cases but

18 had "not been successful in that argument at the Supreme Court." (*Id*. at 24.) And regarding

19 Rosales's case, Rosales's appellate counsel testified that he did not consider asking for a new trial

20 if the anarchy conviction was overturned and was not familiar with the federal doctrine of

21 retroactive misjoinder; however, he did not "think the Supreme Court would have . . . allow[ed] a

22 new trial on everything else with [the anarchy] evidence no longer" being admitted. (*Id*. at 23, 28.)

23

8

## 2.      Standard for ineffective-assistance-of-counsel claims

In *Strickland v. Washington*, the Supreme Court propounded a two-prong test for analysis of claims of ineffective assistance of counsel requiring the petitioner to demonstrate (1) that the attorney's "representation fell below an objective standard of reasonableness," and (2) that the attorney's deficient performance prejudiced the defendant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. 668, 688, 694 (1984). A court considering a claim of ineffective assistance of counsel must apply a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id*. at 689. The petitioner's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. at 687. Additionally, to establish prejudice under *Strickland*, it is not enough for the habeas petitioner "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id*. at 693. Rather, the errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id*. at 687.

This standard is also utilized to review appellate counsel's actions: a petitioner must show "that [appellate] counsel unreasonably failed to discover nonfrivolous issues and to file a merits brief raising them" and then "that, but for his [appellate] counsel's unreasonable failure to file a merits brief, [petitioner] would have prevailed on his appeal." *Smith v. Robbins*, 528 U.S. 259, 285 (2000).

Where a state district court previously adjudicated the claim of ineffective assistance of counsel under *Strickland*, establishing that the decision was unreasonable is especially difficult. *See Richter*, 562 U.S. at 104–05. In *Richter*, the United States Supreme Court clarified that *Strickland* and § 2254(d) are each highly deferential, and when the two apply in tandem, review is

doubly so. *Id.* at 105; *see also Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) (internal quotation marks omitted) ("When a federal court reviews a state court's Strickland determination under AEDPA, both AEDPA and *Strickland*'s deferential standards apply; hence, the Supreme Court's description of the standard as doubly deferential."). The Supreme Court further clarified that, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 562 U.S. at 105.

### 3.      State court determination

In affirming the state district court's denial of Rosales's state post-conviction petition for a writ of habeas corpus, the Nevada Supreme Court held:

> Next, Rosales contends that the district court erred in denying his claim of ineffective assistance of appellate counsel. To prove ineffective assistance of appellate counsel, a petitioner must demonstrate that counsel's performance was deficient in that it fell below an objective standard of reasonableness, and resulting prejudice such that the omitted issue would have had a reasonable probability of success on appeal. *Kirksey v. State*, 112 Nev. 980, 998, 923 P.2d 1102, 1114 (1996). Appellate counsel is not required to raise every non-frivolous issue on appeal. *Jones v. Barnes*, 463 U.S. 7 45, 751 (1983). Rather, appellate counsel will be most effective when every conceivable issue is not raised on appeal. *Ford v. State*, 105 Nev. 850, 853, 784 P.2d 951, 953 (1989).
>
> Rosales argues that appellate counsel was ineffective for failing to argue that, based on the doctrine of "retroactive misjoinder," Rosales was entitled to a new trial on the remaining counts following the reversal of the criminal anarchy conviction on direct appeal. Rosales relies on case law from the federal courts for the doctrine of "retroactive misjoinder," which occurs when "joinder of multiple counts was proper initially, but later developments—such as . . . an appellate court's reversal of less than all convictions—render the initial joinder improper" and results in "[p]rejudicial spillover from evidence used to obtain [the] conviction subsequently reversed on appeal." *United States v. Lazarenko*, 564 F.3d 1026, 1043 (9th Cir. 2009) (internal quotations omitted). Rosales contends that, because the graffiti that was used in support of the criminal anarchy charge was highly inflammatory and would not have been admissible if the case had been tried without the anarchy count, the prejudicial spillover from that evidence required a new trial on the other counts of aggravated stalking, attempted murder, and discharging a firearm into a structure.

1
2
3
4
5
6
7

> This court has never adopted or applied the doctrine of "retroactive misjoinder." Thus, Rosales fails to demonstrate that appellate counsel acted objectively unreasonably by not arguing for a new trial based on a doctrine not recognized by this court. Further, Rosales fails to demonstrate that a "retroactive misjoinder" argument would have had a reasonable probability of success on appeal. Even assuming that this court would have recognized the doctrine, this court concluded on direct appeal that sufficient evidence supported the other convictions, Rosales does not dispute that the jury was properly instructed on the use of the evidence, *see Hymon v. State*, 121 Nev. 200, 211, 111 P.3d 1092, 1100 (2005) (presuming the jury follows its instructions), and Rosales fails to demonstrate "prejudice so pervasive that a miscarriage of justice looms," *Lazarenko*, 564 F.3d at 1043 (internal quotations omitted). Thus, we conclude that the district court did not err in denying this claim.

8  (ECF No. 19-35 at 4–6.)

9  **4.   Analysis**

10   "'Retroactive misjoinder' arises where joinder of multiple counts was proper initially, but

11  later developments—such as a district court's dismissal of some counts for lack of evidence or an

12  appellate court's reversal of less than all convictions—render the initial joinder improper." *United*

13  *States v. Lazarenko*, 564 F.3d 1026, 1043 (9th Cir. 2009) (internal quotation marks and citation

14  omitted). The Nevada Supreme Court, the final arbiter of Nevada law, explained that it had never

15  adopted or applied this doctrine. Indeed, even if the Nevada Supreme Court has acknowledged

16  prejudicial spillover, as Rosales argues, the Nevada Supreme Court, acting in its review of the

17  denial of Rosales's state post-conviction petition, is in the exclusive position to determine whether

18  it would have applied a doctrine on direct appeal if the doctrine had been raised. As such, the

19  Nevada Supreme Court reasonably determined that Rosales failed to demonstrate that his appellate

20  counsel acted objectively unreasonably by not arguing for a new trial based on an unrecognized

21  doctrine under Nevada law.

22   Furthermore, regarding prejudice, the Nevada Supreme Court reasonably noted that the

23  jury was properly instructed on the use of the evidence. In fact, the jury was instructed that it "must

1   decide each count separately on the evidence and the law applicable to it, uninfluenced by your

2   decision as to any other count" and its verdict "may never be influenced by sympathy, passion,

3   prejudice, or public opinion." (ECF No. 18-34 at 14, 31.) Moreover, because the Nevada Supreme

4   Court concluded on post-conviction review that Rosales failed to demonstrate prejudice warranting

5   reversal, Rosales fails to demonstrate that the very same court—the Nevada Supreme Court—

6   would have come to a different conclusion on direct review. Thus, Rosales fails to demonstrate

7   that *if* his appellate counsel had made a retroactive misjoinder argument on appeal and *if* the

8   Nevada Supreme Court chose to recognize this never-previously-applied doctrine, he would have

9   prevailed on appeal.

10      Therefore, the Nevada Supreme Court's determination that Rosales failed to demonstrate

11   his appellate counsel acted deficiently or resulting prejudice constituted an objectively reasonable

12   application of *Strickland*'s performance and prejudice prongs. *Strickland*, 466 U.S. at 688, 694.

13   Rosales is not entitled to federal habeas relief on Ground 5.

14      **B.   Ground 6—original plea counsel and trial counsel's failure to request suppression of evidence**

15

16      In ground 6, Rosales alleges that his counsel were ineffective for failing to seek suppression

17   of evidence on the basis that the police unlawfully entered his mother's apartment in violation of

18   his rights under the Fifth, Sixth, and Fourteenth Amendments. (ECF No. 54 at 32.)

19      **1.   Background information**

20      Prior to trial, Rosales's counsel moved to suppress the evidence obtained due to law

21   enforcement's warrantless search of Rosales's mother's apartment. (ECF No. 17-1.) The state

22   district court denied the motion to suppress, finding that Connie Rosales, Rosales's mother,

23   voluntarily consented to the search. (ECF No. 17-8 at 207.) Rosales now contends that his counsel

1   should have also moved to suppress on the basis that (1) law enforcement's initial entry into the

2   apartment—prior to contacted and obtaining Ms. Rosales's consent—was itself illegal and (2) the

3   consent did not cure the prior illegal entry. (*See* ECF No. 83 at 68.)

4        During an evidentiary hearing held on the original motion to suppress, Detective Jim

5   Duncan with the Reno Police Department testified that while Rosales, who had been picked up in

6   a stairwell outside of the apartment, was being interview, he returned to the apartment complex

7   along with two other law enforcement officers "to advise her, Ms. Rosales, his mother, of her son's

8   circumstances, that he wouldn't be coming home anytime soon, so she wasn't worried about his

9   disappearance." (ECF No. 17-8 at 78, 83.) Detective Duncan had heard that Ms. Rosales "was 80

10  years old and didn't get around very well," so he had concerns about Ms. Rosales not knowing

11  that she had lost her primary caretaker, Rosales. (*Id*. at 83.) Detective Duncan knocked on Ms.

12  Rosales's apartment door and waited. (*Id*. at 84.) He got no response, knocked again, and stated

13  loudly that he was a police officer. (*Id*. at 84–85.) When Ms. Rosales still did not answer the door,

14  Detective Duncan thought Ms. Rosales may be asleep or something may have happened to her.

15  (*Id*. at 85–86.) He tried the door handle, and it was unlocked. (*Id*. at 86–87.) Once he pushed the

16  door open, Detective Duncan announced himself and called Ms. Rosales's name, but he did not

17  get any response. (*Id*. at 87.) Detective Duncan turned the lights on in the studio apartment and

18  saw a woman laying on her side with her back facing him on a mattress on the floor. (*Id*. at 88,

19  92.) Detective Duncan believed she was dead or close to dying and touched her neck looking for

20  a pulse. (*Id*. at 88.) Ms. Rosales rolled over, and Detective Duncan informed her of her son's arrest.

21  (*Id*. at 88–89.)

22       Ms. Rosales used the restroom in her apartment, and then she and Detective Duncan

23  "continued to talk" for "[p]robably 10 to 15 minutes." (*Id*. at 90.) Detective Duncan was not aware

13

that any of Rosales's belongings were going to be in the apartment, but during his conversation with Ms. Rosales, she indicated that some of the unpacked boxes in her apartment belonged to Rosales. (*Id*. at 91.) Detective Duncan then stated to Ms. Rosales: "'Well, we'd be interested in searching this residence. Of course, you're under no obligation to allow such a search. If you prefer, I can always apply to a magistrate and let him decide.'" (*Id*.) Ms. Rosales "said it would be fine," but she made Detective Duncan "promise [they] wouldn't unpack everything and leave it all a dirty mess." (*Id*. at 91–92.) Detective Duncan than produced a written permission to search form, filled out the form with Ms. Rosales, and read it to Ms. Rosales. (*Id*. at 93.) Ms. Rosales signed the written form. (*Id*.)

## 2. Standard for assessing an alleged Fourth Amendment violation

The Fourth Amendment protects individuals from "unreasonable searches and seizures." U.S. Const. amend. IV. The core of this guarantee is "the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Florida v. Jardines*, 569 U.S. 1, 6 (2013) (internal quotation marks omitted). When an individual has a reasonable expectation of privacy, law enforcement may not conduct a search absent consent or a search warrant unless an exception applies, such as an exigent circumstance or an emergency. *See Kentucky v. King*, 563 U.S. 452, 459 (2011); *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973).

"It is well established that, under the 'fruits of the poisonous tree' doctrine, evidence obtained subsequent to a violation of the Fourth Amendment is tainted by the illegality and is inadmissible, despite a person's voluntary consent, unless the evidence obtained was 'purged of the primary taint.'" *United States v. Washington*, 490 F.3d 765, 774 (9th Cir. 2007). The question in a "fruit of the poisonous tree" case "is whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality

or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. United States*, 371 U.S. 471, 487–88 (1963) (internal quotation marks omitted). The test in these circumstances is whether the consent was (1) voluntary and (2) "sufficiently an act of free will to purge the primary taint of the unlawful invasion." *Id.* at 486. To determine if consent purged the taint of the illegal entry, three factors are analyzed: "(1) the temporal proximity of the consent and the illegal seizure; (2) the presence of intervening circumstances; and (3) particularly, the purpose and flagrancy of the official misconduct." *Washington*, 490 F.3d at 776.

### 3.    State court determination

In affirming the state district court's denial of Rosales's state post-conviction petition for a writ of habeas corpus, the Nevada Supreme Court held:

> First, Rosales contends that trial counsel was ineffective for failing to move to suppress evidence on the basis that his mother's consent to a search of their apartment was tainted by the police officers' illegal entry into the apartment. He argues that evidence seized from the apartment should have been suppressed as fruit of the poisonous tree because the officers' warrantless entry into the apartment was not justified by exigent circumstances and the subsequent consent did not "cure" the illegal entry. We conclude that Rosales fails to demonstrate that counsel's performance was deficient or that he was prejudiced. Even if the entry into the apartment was impermissible under the Fourth Amendment, the mere fact of an illegal entry alone does not vitiate any subsequent consent to a search. Rather, the issue of whether the consent is valid depends on whether the consent was sufficiently attenuated from the illegal entry. *See Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963); *United States v. Furrow*, 229 F.3d 805, 813-14 (9th Cir. 2000), *overruled on other grounds by United States v. Johnson*, 256 F.3d 895 (9th Cir. 2001); *Howe v. State*, 112 Nev. 458, 469-70, 916 P.2d 153, 161-62 (1996). Rosales argues only that the illegal entry tainted the consent; he fails to provide relevant authority or cogent argument as to whether the consent was sufficiently attenuated so as to dissipate the taint of the illegal entry. *See Maresca v. State*, 103 Nev. 669, 673, 748 P.2d 3, 6 (1987). Therefore, he fails to demonstrate that the district court erred in concluding that the consent was valid despite the warrantless entry and thus trial counsel was not ineffective.

(ECF No. 19-35 at 3.)

### 4.   *De novo* review is not appropriate

Rosales argues that the Nevada Supreme Court's following determination was unreasonable: his appellate briefing "fail[ed] to provide relevant authority or cogent argument as to whether the consent was sufficiently attenuated so as to dissipate the taint of the illegal entry." (ECF No. 83 at 82.) Instead, Rosales argues that he adequately briefed this issue. (*Id*. at 82.) Consequently, Rosales argues that this Court should review this ground *de novo*. (*Id*. at 85.)

As the Nevada Supreme Court reasonably determined, Rosales's appellate briefs did not develop the argument that his mother's consent was sufficiently attenuated from the illegal entry to cure it. In his opening appellate brief to the Nevada Supreme Court following the denial of his state post-conviction petition, Rosales only relevantly argued that (1) his mother's "consent to the search following the illegal entry into her apartment made all evidence obtained fruit of the poisonous tree," and (2) "[t]he consent did not 'cure' the illegal entry and make the search legal." (ECF No. 19-32 at 27.) In his reply brief to the Nevada Supreme Court, Rosales again argued "that the consent was the fruit of the poisonous tree." (ECF No. 19-34 at 6.) Rosales then addressed an argument raised by the State in its answering brief:

> Respondent argues that if the entry was illegal[,] it is still possible to save the search if there was sufficient time between the entry and the consent, whether *Miranda* warnings were given, the presence of intervening circumstances and the flagrancy of the misconduct. Respondent does not even argue the first three factors, focusing instead on the officers' good intentions in making their entry. As [Rosales] has argued throughout this appeal, however, there were no good intentions. The expressed reason for the visit to the apartment was a sham and it was not reasonable to think the failure of an 80 year old to answer the door is an exigent circumstance. The consent was the result of the illegal entry and was not valid.

(*Id*. at 7.)

Rosales's appellate argument that his mother's consent did not cure the illegal entry was conclusory. Indeed, as the Nevada Supreme Court reasonably concluded, Rosales did not support

16

1   this argument with relevant authority or cogent argument. As such, this Court finds that the Nevada

2   Supreme Court's finding in this regard was not unreasonable, so this Court declines to review this

3   ground *de novo*.

4               **5.      Analysis**

5           "Where defense counsel's failure to litigate a Fourth Amendment claim competently is the

6   principal allegation of ineffectiveness, the defendant must also prove that his Fourth Amendment

7   claim is meritorious and that there is a reasonable probability that the verdict would have been

8   different absent the excludable evidence." *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986). As

9   the Nevada Supreme Court reasonably concluded, Rosales fails to prove that his Fourth

10  Amendment claim is meritorious.

11          Even if this Court concludes that that law enforcement's entry into Ms. Rosales's apartment

12  was illegal under the Fourth Amendment, as the Nevada Supreme Court appears to have

13  concluded, Rosales must still demonstrate that Ms. Rosales's consent did not purge the taint of the

14  illegal entry in order to suppress the weapon found during the search and his subsequent

15  confession. As the Nevada Supreme Court reasonably concluded, Rosales fails to meet this

16  demonstration.

17          After Detective Duncan entered the apartment and woke up Ms. Rosales and while Ms.

18  Rosales was still laying down on her mattress on the floor, he explained why he was there and why

19  Rosales had been arrested. (ECF No. 17-8 at 89.) Ms. Rosales explained that she had no knowledge

20  that Rosales was involved in any of the activities described. (*Id*.) Ms. Rosales then used the

21  restroom, and when she returned, she continued to talk with Detective Duncan for approximately

22  10 to 15 minutes. (*Id*. at 90.) Detective Duncan then asked Ms. Rosales about a voluntary search

23  after she mentioned that some of Rosales's belongings were in the apartment. (*Id*. at 91.) Ms.

1   Rosales verbally agreed, instructing the law enforcement officers not to make a mess, and signed

2   a written consent form. (*Id*. at 92, 94–95.) Based on this testimony at the suppression hearing and

3   assessing the three factors to determine if Ms. Rosales's consent purged the taint of the illegal

4   entry, it appears that: (1) there was at least some time lapse—amounting to 10 to 15 minutes—

5   between the illegal entry and consent; (2) there was at least some appreciable intervening

6   circumstances between the illegal entry and consent since Detective Duncan and Ms. Rosales had

7   two discussions and Ms. Rosales visited the restroom during the time period; and Detective

8   Duncan's illegal entry—although perhaps also for the subsequent purpose of locating Ms. Rosales

9   to seek her consent to search the apartment—was primarily premised on his concern for Ms.

10  Rosales's wellbeing seeing as Ms. Rosales was 80 years old and Rosales, who had been arrested

11  without Ms. Rosales's knowledge, was her caretaker.

12      Therefore, the Nevada Supreme Court's determination that Rosales failed to demonstrate

13  his counsel acted deficiently in not moving for suppression based on Detective Duncan's illegal

14  entry constituted an objectively reasonable application of *Strickland*'s performance prong.

15  *Strickland*, 466 U.S. at 688. Rosales is not entitled to federal habeas relief on Ground 6.

16          **C.      Ground 8—insufficient evidence for attempted murder**

17      In ground 8, Rosales alleges that the prosecution presented insufficient evidence to convict

18  him of attempted murder in violation of his rights under the Fifth, Sixth, and Fourteenth

19  Amendments. (ECF No. 54 at 35.)

20              **1.      Background information**

21      Following Castillo's testimony, Rosales's trial counsel moved for a directed verdict, asking

22  the state district court to advise the jury to acquit on the attempted murder charge. (ECF No. 18-

23  28 at 26–27.) In response to the motion for a directed verdict, the prosecutor argued: "It's the

State's position that . . . maybe one gunshot he's trying to scare her, multiple gunshots has a different weight and carries a more convincing piece of evidence as to his intent at the time." (*Id.* at 28.) The state district court denied the motion. (*Id.* at 29.)

Later, during closing arguments, the prosecution made a similar argument to the jury:

> The tough one may be Count Nine, the attempted murder. You saw Martha Castillo, Martha Urquilla as charged in the indictment. You saw her on the stand. She's just a little scared lady that was working trying to do her job, trying to take care of herself. And somebody comes in to the place she's working, she's in the bathroom, she doesn't know anybody is there, other than her coworker. She comes out and here's somebody pointing a pistol at her. All right. At that point, maybe not. It might not be attempted murder. He shoots her. He shoots again, because she testified there were shots fired, gunshots, I heard gunshots, more than one.
>
> You look at the exhibits, you can see the hallway where she was shot and the next exhibit connected or under the same number but with a letter shows another gunshot into the doorjamb. Nobody is certain whether the doorjamb was first or the one through her leg was first. But I submit to you, what else could be his purpose other than to kill her to shoot twice? If he just wants to scare her, shoot once into the ceiling. That's enough. If he just wants to hurt her, just shoot once and see if you hit her.
>
> Remember, he's shooting knuckle balls, so he doesn't have a clue where this thing is going to go once he fires it off. That's the State's evidence as far as his intent to unlawfully with malice aforethought, deliberation and premeditation kill her. He didn't accomplish it. But that's the State's evidence, he shot twice, there's no other good reason other than I really want to put you down, lady.
>
> And if you don't think that's proven, okay. You know, Martha was hurt. She wasn't hurt permanently damaged or the sense of unable to walk or paralyzed or anything like that. And she, you saw her, she's still getting along, she's still work going, that sort of thing. I'm sure she was scared. Even Mr. Rosales thought, though, that he might be more scared than she was. But there was absolutely no good reason, no reason in this world other than an attempt to kill her to fire multiple shots in that little, bitty hallway. None the all [sic]. But you decide.

(ECF No. 18-29 at 137–38.) And regarding Rosales's weapon generally, the prosecution argued to the jury: "whatever you shot acted like a knuckle ball in baseball, had no spin to it, had not much accuracy, just went all over the place like a knuckle ball is. You can't exactly determine where they're going to land." (*Id.* at 134.)

## 2.       Standard for sufficiency-of-the-evidence claims

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). A federal habeas petitioner "faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds." *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005). On direct review of a sufficiency of the evidence claim, a state court must determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The evidence is to be viewed "in the light most favorable to the prosecution." *See id*. Federal habeas relief is available only if the state-court determination that the evidence was sufficient to support a conviction was an "objectively unreasonable" application of *Jackson*. *See Juan H.*, 408 F.3d at 1275 n.13.

## 3.       Nevada law on attempted murder

Sufficiency of the evidence claims are judged by the elements defined by state law. *Jackson*, 443 U.S. at 324 n.16. Nevada law provides that "[a]n act done with the intent to commit a crime, and tending but failing to accomplish it, is an attempt to commit that crime." Nev. Rev. Stat. § 193.330(1). And an attempt to commit murder "can only be committed with express malice." *Sharma v. State*, 118 Nev. 648, 652, 56 P.3d 868, 870 (2002); *see also Keys v. State*, 104 Nev. 736, 740, 766 P.2d 270, 273 (1988) ("Attempted murder is the performance of an act or acts which tend, but fail, to kill a human being, when such acts are done with express malice, namely, with the deliberate intention unlawfully to kill."); Nev. Rev. Stat. § 200.010(1) ("Murder is the unlawful killing of a human being."). "Express malice is that deliberate intention unlawfully to take away the life of a fellow creature, which is manifested by external circumstances capable of

20

proof." Nev. Rev. Stat. § 200.020(1); *see also Dearman v. State*, 93 Nev. 364, 367, 566 P.2d 407,

409 (1977) ("Intent to kill, as well as premeditation, may be ascertained or deduced from the facts

and circumstances of the killing, such as use of a weapon calculated to produce death, the manner

of use, and the attendant circumstances."); Nev. Rev. Stat. § 193.200 ("Intention is manifested by

the circumstances connected with the perpetration of the offense.").

### 4.    State court determination

In affirming in part and reversing in part Rosales's conviction following his jury trial, the

Nevada Supreme Court held:

> Rosales argues that the State failed to prove the element of "express malice"
> as part of its attempted-murder-with-a-deadly-weapon charge. In *Keys v. State*, 104
> Nev. 736, 740, 766 P.2d 270, 272 (1988), this court explained that to prove
> attempted murder the prosecution must prove that the defendant acted with
> "deliberate intention to kill." *See* NRS 193.330; 200.010. Rosales argues that the
> State did not produce enough evidence to prove a "deliberate intention to kill"
> because Ms. Castillo did not testify that she saw him aim the gun at her and the
> bored-out gun fired "knuckle balls" that flew every which way. We conclude that
> the record contains substantial evidence from which the jury could infer that
> Rosales acted with "express malice" and "deliberate intention to kill." *See McNair*,
> 108 Nev. at 56, 825 P.2d at 573.
>
> Intent "is manifested by the circumstances connected with the perpetration
> of the offense, and the sound mind and discretion of the person accused." NRS
> 193.200. "NRS 200.020(1) defines 'express malice' as 'that deliberate intention
> unlawfully to take away the life of a fellow creature, which is manifested by
> external circumstances capable of proof.'" *Sharma v. State*, 118 Nev. 648, 659, 56
> P.3d 868, 874 (2002) (emphasis omitted). In *Sharma*, an attempted-murder-with-a-
> deadly-weapon case, we noted that NRS 193.200 and 200.020 "implicitly
> acknowledge that intent can rarely be proven by direct evidence of a defendant's
> state of mind, but instead is inferred by the jury from the individualized, external
> circumstances of the crime, which are capable of proof at trial." *Id*.
>
> Here, the external circumstances support the jury's inference that Rosales
> acted with express malice in shooting Ms. Castillo. When Ms. Castillo encountered
> Rosales in the office building, he fired two shots at her, hitting her with one. The
> jury could have concluded that firing two shots at her from the end of a hallway
> was sufficient evidence of intent to kill. *See Valdez v. State*, 124 Nev. 1172, 1197,
> 196 P.3d 465, 481 (2008) ("[T]he jury may infer intent to kill from the manner of
> the defendant's use of a deadly weapon."); *Dearman v. State*, 93 Nev. 364, 367,
> 566 P.2d 407, 409 (1977) (use of deadly weapon can be evidence of intent to
> murder); *see also* Jeffrey F. Ghent, Annotation, *What Constitutes Attempted*

*Murder*, 54 A.L.R.3d 612 (1973) (firing a gun at victim and wounding her can be sufficient to prove intent to kill). Also supporting an inference of intent to kill was Rosales's graffiti boasting that he "did the [Kietzke Lane office building] shooting ... [one] hit, lower leg."

(ECF No. 19-12 at 8–9.)

## 5.    Analysis

It is true that, during his second law enforcement interview regarding the shooting of Castillo, Rosales stated that he "clos[ed his] eyes and just point[ed] in the direction" and "didn't want to hurt nobody." (ECF No. 16-11 at 3, 5.) This testimony supports Rosales's current contention that he lacked the deliberate intention to kill; rather, he just recklessly fired the gun and happened to hit Castillo. And it also appears true, based on the prosecution's closing argument, that they did not think they had a strong case for attempted murder.[5] However, as the Nevada Supreme Court reasonably noted, Rosales used a weapon calculated to produce death—a handgun—to fire two shots in Castillo's direction in a narrow hallway. Viewing this evidence "in the light most favorable to the prosecution" (*Jackson*, 443 U.S. at 319), the Nevada Supreme Court reasonably determined that a rational trier of fact could have found beyond a reasonable doubt that Rosales acted with express malice in shooting Castillo. *In re Winship*, 397 U.S. at 364; *Juan H.*, 408 F.3d at 1274; *Sharma*, 118 Nev. at 652, 56 P.3d at 870; *Keys*, 104 Nev. at 740, 766 P.2d at 273. Accordingly, the Nevada Supreme Court's denial of Rosales's insufficient evidence claim was neither contrary to, nor an unreasonable application of, clearly established federal law and

---

[5]Notably, when Rosales originally pleaded guilty to the charges, the prosecutor at the time had represented to Rosales's counsel at the time that he did "not feel he ha[d] a strong case on" attempted murder and "[a]ll other charges that could be brought against [Rosales regarding the shooting of Castillo were] beyond SOL except attempted murder." (ECF No. 16-17 at 2.)

1  was not based on an unreasonable determination of the facts.  Rosales is not entitled to federal

2  habeas relief for ground 8.

3  **IV.     CERTIFICATE OF APPEALABILITY**

4      This is a final order adverse to Rosales. Rule 11 of the Rules Governing Section 2254 Cases

5  requires this Court to issue or deny a certificate of appealability (COA). This Court has *sua sponte*

6  evaluated the claims within the petition for suitability for the issuance of a COA. *See* 28 U.S.C. §

7  2253(c); *Turner v. Calderon*, 281 F.3d 851, 864–65 (9th Cir. 2002). Under 28 U.S.C. § 2253(c)(2),

8  a COA may issue only when the petitioner "has made a substantial showing of the denial of a

9  constitutional right." With respect to claims rejected on the merits, a petitioner "must demonstrate

10 that reasonable jurists would find the district court's assessment of the constitutional claims

11 debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463

12 U.S. 880, 893 & n.4 (1983)). For procedural rulings, a COA will issue only if reasonable jurists

13 could debate (1) whether the petition states a valid claim of the denial of a constitutional right and

14 (2) whether this Court's procedural ruling was correct. *Id*.

15     Applying these standards, this Court finds that a certificate of appealability is unwarranted.

16 **V.      CONCLUSION**

17     IT IS THEREFORE ORDERED that the second amended petition for a writ of habeas

18 corpus under 28 U.S.C. § 2254 **[ECF No. 54] is denied**.

19     IT IS FURTHER ORDERED that a certificate of appealability is denied.

20     IT IS FURTHER ORDERED that the Clerk of Court is directed to substitute Gabriela

21 Najera for Respondent Dwight Neven, enter judgment accordingly, and close this case.

22     Dated:  December 27, 2022.

23

ROBERT C. JONES
UNITED STATES DISTRICT COURT